**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROWENA MARTIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-0718 |
| | § | |
| ST. LUKE'S EPISCOPAL HOSPITAL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Rowena Martin sued her employer, St. Luke's Episcopal Hospital and its affiliated entities (collectively "St. Luke's"), after she was fired, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008).  Martin claims that a new supervisor restructured her department in a way that increased her work load and made the work environment more stressful, which aggravated the effects of Martin's high blood pressure.  Martin alleges that, as a result, she made errors that led St. Luke's to warn her, place her on probation, and then fire her.  Martin argues that the errors resulted from "sometimes" having headaches, "moments of confusion," and "floaters" crossing her field of vision, making it hard to concentrate.  She alleges that St. Luke's discriminated against her on the basis of her disability in firing her and in failing to provide a reasonable accommodation.

St. Luke's moved for summary judgment, arguing that the undisputed evidence shows that it fired Martin after repeated serious errors that persisted after warnings and probation; and that Martin's medical condition did not rise to the level of a disability and, even if it did, it was not a

factor in the decision to fire her.  St. Luke's also asserts that Martin never asked for the accommodations she now identifies and that they are not reasonable accommodations under the ADA.  Martin responded to the motion, St. Luke's replied, and the court heard oral argument. (Docket Entry Nos. 20, 25,  26, & 31).

Based on the complaint; the motion for summary judgment, response, and reply; the oral arguments; and the relevant law, the court grants St. Luke's motion and enters final judgment by separate order.  The reasons are explained in detail below.

I.     **Background**

St. Luke's employed Martin from 1977 until April 29, 2012.  (Docket Entry No. 25, Ex. A, at 2).  During her 35 years at St. Luke's, Martin worked in the admitting department, which covered different hospital areas.  (Docket Entry No. 20, Ex. A-1, Martin Depo. at 20–21).  Around 2005, St. Luke's transferred Martin to the Pre-Admit Testing ("PAT") section of the Patient Access Services Department ("PAS") as a Senior Admitting Interviewer.  (*Id.*).

At PAT, Martin was responsible for preregistering hospital patients before their surgeries by collecting demographic and insurance information and having them sign medical consent forms and insurance assignments.  Martin collected and verified each patient's insurance information, and the patients paid their copays and other costs through Martin.  (*Id.* at 22–23).  Martin's job was to correctly input patient data and match that data to the correct patient. (*Id.*).  Martin acknowledged in her deposition that other St. Luke's employees, including doctors, and insurance companies, relied on the information she gathered and recorded.  Inaccurate information could result in a patient receiving incorrect services or prevent the patient from receiving insurance coverage.  A mismatch of patient and data could cause those problems and also violate patient confidentiality and the Health

Insurance Portability and Accountability Act ("HIPAA").  Martin received training in HIPAA and knew that the law required protecting patient privacy.  (*Id.* at 35).  Martin testified that it was "never okay" to make mistakes in admitting a patient and that it was "never acceptable" to give one patient's paperwork to another.  (*Id.* at 36).

Martin was diagnosed sometime before 2009 with hypertension.  (*Id.* at 31, 91; Docket Entry No. 25 at 5).  She has taken medication since her diagnosis but has not seen a doctor for the condition since 2009.  Martin monitored her blood pressure regularly from 2009 to 2010.  (Docket Entry No. 20, Ex. A-1, Martin Depo. at 56–57).  Martin's blood pressure became more stable in 2010, and she stopped regularly monitoring it because she "got tired of doing it."  (*Id.* at 57).  She monitored her blood pressure only "occasionally" in 2011 and 2012.  Somewhat inconsistently, Martin claims that during this period, she had "problems with [her] vision, headaches and confusion" at work that she attributes to her high blood pressure and stress.  (*Id.* at 92).  Martin has had other serious health problems in the past, including anemia, nearsightedness, and colon cancer.  She does not allege any issue with St. Luke's as a result of those medical problems or the treatment they required.  She testified that those medical problems were under control, and that the only time she had been physically or mentally limited was when she was being treated for cancer in 2003.  (*Id.* at 206).

In 2011, Monica Schluer became the PAT supervisor and Martin's direct manager.  (Docket Entry No. 20 at 4; Ex. A-1, Martin Depo. at 44).  PAT was restructured and each employee's workload increased.  Martin was not singled out; the changes applied to all PAT employees.  Martin and other PAT employees were expected to admit each patient in 15 minutes or less.  (Docket Entry

No. 20, Ex. A-1, Martin Depo. at 130).   PAT employees were also expected to register at least 20 patients per day.   (*Id.* at 162).   Martin consistently failed to meet these goals.

In September 2011, Schluer and Christine Broussard, another manager, met with Martin to discuss her low productivity.   (Docket Entry No. 25, Ex. C, Schluer Depo. at 28–31).   Schluer offered to give Martin a training specialist to help her increase the number of patients she registered per day.   (*Id.*; Docket Entry No. 20, Ex. A-1, Martin Depo. at 43–44).   Martin declined.   (Docket Entry No. 25, Ex. C, Schluer Depo. at 28–31).

In December 2008, Martin entered the incorrect insurance code when she registered a patient. Due to the error, the patient's insurance coverage could not be verified, threatening the receipt of benefits.   Martin received a written "notice of concern," a stage in St. Luke's progressive discipline, in January 2009.   (Docket Entry No. 20, Ex. A-2, Martin Depo. at Ex. 6).

In October 2011, Martin incorrectly filed a "face sheet" with a patient's confidential information in another patient's file.   (Docket Entry No. 20, Exs. A-1, Martin Depo. at 62; A-2, Martin Depo. at Ex. 7).   The error was discovered in November 2011.   Schluer gave Martin a written warning.   (Docket Entry No. 20, Ex. A-1, Martin Depo. at 64).   Martin admitted the error, telling Schluer that she made the mistake because she used a printer shared with other PAT employees.   (*Id.* at 65; Docket Entry No. 20, Ex. A-2, Martin Depo. at Ex. 7).   This error violated HIPAA as well as St. Luke's policies.   Schluer warned Martin that any future error could lead to corrective action, including possible termination.   (*Id.*).

In January 2012, St. Luke's discovered that in July 2011, Martin had entered one patient's information into another patient's medical file.   (Docket Entry No. 20, Ex. A-1, Martin Depo. at 66–69).   Martin offered no explanation for her error.   (Docket Entry No. 20, Ex. A-2, Martin Depo.

at Ex. 8).  This error also violated HIPAA as well as St. Luke's rules.  Schluer placed Martin on probation and again warned that any future error could lead to corrective action "up to and including discharge."  (*Id.*).  Schluer reminded Martin that "it is imperative to ensure the correct patient has been properly identified during each registration."  (*Id.*).

Martin made another similar error two weeks after being placed on probation.  In April 2012, St. Luke's discovered that Martin had told a patient to sign another patient's Advance Beneficiary Notice of Noncoverage Form (ABN).  Medicare requires an ABN to inform a patient that it may not cover a doctor-recommended procedure.  (Docket Entry No. 20 at 6; Ex. A-1, Martin Depo. at 82).  After having the patient sign the wrong ABN, Martin then put the form in another patient's file.  (Docket Entry No. 20, Exs. A-1, Martin Depo. at 80–86; A-2, Martin Depo. at Ex. 9).  This again violated both HIPAA and St. Luke's rules.  St. Luke's followed progressive discipline and placed Martin on investigative suspension.  (Docket Entry No. 20, Ex. A-1, Martin Depo. at 81).

During Martin's suspension, Schluer's manager, NaToshia Joseph, and Mercedes Tang, the PAS head, considered what punishment would be appropriate.  Because Martin had committed four errors in recording patient data, three of which were HIPAA violations, her supervisors considered the errors to be "extremely serious."  (Docket Entry No. 20, Ex. C, Joseph Affidavit).

Amber Crawford, an Employee Relations Specialist in the Human Resources Department, initially recommended placing Martin on probation follow-up rather than firing her because of her long tenure at St. Luke's.  (Docket Entry No. 25, Ex. E).  Joseph and Tang disagreed, believing that Martin should be fired for her repeated serious errors, including one committed shortly after placement on probation.  (*Id.*).  Although the Human Resources Department's practice was to consider employee tenure in disciplinary termination decisions, no written St. Luke's policy stated

5

that tenure was a factor, much less a critical one.  (*Id.*).  To the contrary, the practice in PAS was to

fire any employee who violated HIPAA while on probation, without considering that employee's

length of service.  (*Id.*; Docket Entry No. 25, Ex. C, Schluer Depo.).

Human Resources approved the decision to fire Martin.  (Docket Entry No. 25, Ex. C at

53–55). On April 30, 2012, Schluer and Cynthia Okeke, another PAT manager, informed Martin that

St. Luke's had decided to fire her.  (Docket Entry No. 20, Exs. A-1, Martin Depo. at 81; A-2, Martin

Depo. at Ex. 9).  Martin filed this lawsuit on March 14, 2013.

Martin claims that "the increase in the workload and the high stress environment exacerbated

[her] issues with [her] blood pressure," (Docket Entry 25, Ex. A, Martin Affidavit), and that the

errors leading to her termination were caused by "her medical conditions and her medications."

(Docket Entry No. 1 at 3).  Martin also claims that she told Schluer about her condition but that St.

Luke's did not provide her with a reasonable accommodation.  (Docket Entry Nos. 1 at 3–4; 20, Ex.

A-1, Martin Depo. at 121).  In her deposition, Schluer stated that Martin had not told her about

severe headaches or moments of confusion at work from her high blood pressure or asked for an

accommodation.  (Docket Entry No. 25, Ex. C, Schluer Depo. at 28).

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on its pleadings allegations. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.   The ADA

Martin claims that her high blood pressure is a disability under the ADA and that St. Luke's terminated her because of this disability. St. Luke's responds that Martin was not disabled and that

she was terminated for a legitimate, nondiscriminatory reason: the three patient-data errors she made from July 2011 to February 2012, violating HIPAA and St. Luke's rules, including two errors made after she was warned of the consequences of further errors, and one error made after she was placed on probation.

### A.    The Legal Standard

Section 12112(a) of the ADA as amended states:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

When a plaintiff presents indirect or circumstantial evidence of discrimination, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc*., 376 F.3d 305 (5th Cir. 2004). *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009) (citing *McInnis v. Alamo Comm. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000)). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination. *Abarca v. Metro. Transit Auth*., 404 F.3d 938, 941 (5th Cir. 2005); *Rachid,* 376 F.3d at 312. To make such a showing, the plaintiff must show that "(a) she is disabled, has a record of having a disability, or is regarded as disabled, (b) she is qualified for her job, (c) she was subjected to an adverse employment action on account of her disability or the perception of her disability, and (d) she was replaced by or treated less favorably than non-disabled employees." *Chevron Phillips*, 570 F.3d at 615 (citing *McInnis v. Alamo Comm. College Dist.*, 207

F.3d 276, 279 (5th Cir. 2000)); *see also Cardiel v. Apache Corp.*, 559 Fed. App'x 284, 288 (5th Cir. 2014) (unpublished); *Lee v. Kansas City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009).

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Chevron Phillips*, 570 F.3d at 615 n.6. The plaintiff must then identify or offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

In a pretext case, the plaintiff must point to disputed facts supporting a finding that the reason offered by the defendants was not the true reason for the plaintiff's termination. *Rachid*, 376 F.3d at 312. In a mixed-motive case, if the plaintiff shows that illegal discrimination was a motivating factor in the challenged employment decision, the defendant may respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Id.*

The plaintiff has the ultimate burden of showing a genuine dispute of material fact as to whether the defendant discriminated against her on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143. The question on summary judgment is whether there is a

conflict in substantial evidence to create a jury question of disability discrimination.  *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503 (5th Cir. 2003).

      **B.**      **Disability**

"As a threshold requirement in an ADA claim, the plaintiff must . . . establish that he has a disability."  *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 758 (5th Cir. 1996).  The relevant time for assessing the existence of a disability is the time of the adverse employment action.  *Chevron Phillips*, 570 F.3d at 618.  The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2).  *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011).

Martin asserts that her high blood pressure substantially affects her major life activities, including working.  St. Luke's argues that Martin's high blood pressure cannot be the basis of an ADA claim because it did not substantially impair any major life activity.

The regulations implementing the ADA provide a nonexhaustive list of major life activities: "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  "[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it."  *Chevron Phillips*, 570 F.3d at 614 (citing 29 C.F.R. § 1630.2(j)).

"[N]either the Supreme Court nor [the Fifth Circuit] have recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff must adduce evidence of an impairment that has actually and substantially limited the major life activity on which

10

[s]he relies." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir. 2011). "[H]igh blood pressure alone, without any evidence that it substantially affects one or more major life activities, is insufficient to bring an employee within the protection of the ADA." *Oswalt v. Sara Lee Corp.*, 74 F.2d 91, 92 (5th Cir. 1996) (quotation omitted). "[C]ourts are to make an individualized determination of whether an employee's impairment constitutes a disability, taking into consideration measures taken by the employee to mitigate the effects of the impairment." *Griffin*, 661 F.3d at 222 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)). Courts should consider "'(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Hale*, 642 F.3d at 500. The ADA Amendments Act of 2008 ("ADAAA") "directs that 'substantially limits' should not be as strictly construed as some courts have required in the past and should not require 'extensive analysis.'" *Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F. Supp. 2d 528, 529 (S.D. Tex. 2011). But "a plaintiff must still show substantial limitation" under the ADAAA. *Mann v. Louisiana High Sch. Athletic Ass'n*, 535 F. App'x 405, 410 (5th Cir. 2013)).

Martin claims that her ability to work was substantially affected. (Docket Entry No. 25 at 5). She testified in her deposition that she had vision problems and "headaches and moments of confusion" attributable to her high blood pressure. She was unsure how often the moments of confusion occurred. (*Id.*; Docket Entry No. 20, Ex. A-1, Martin Depo. at 29). In her affidavit, Martin stated that "[s]ometimes at work, due to [her] high blood pressure, [she] would experience moments of confusion, headaches, and floaters with [her] eyes. Due to these issues, [she] was often unable to concentrate very well." (Docket Entry No. 25, Ex. A, Martin Affidavit).

11

Martin did not rule out that her symptoms could be attributed to her age or to chemotherapy she received in 2003.  (Docket Entry No. 20, Ex. A-1, Martin Depo. at 96, 98).  She stated in her deposition that her symptoms were not just due to high blood pressure.  She testified that it was the combination with job stress that "limited [her] capabilities and function on the level that [she] would normal function under."  (*Id.* at 23).  When she was asked what job functions her blood pressure made her unable to do, she stated:

> Well, it's to register a patient within an adequate amount of time; and because of that request and because we just really didn't have any staff there that knew the job that well, they were always using me as a person for resource.  And, so, all of that is part of that process, from being there every day and then you have your telephone calls and you had a lot of interference while — while you were working.  I did.

(*Id.* at 28).  Martin testified that all of the employees on her assigned floor had the same complaints about inadequate staffing.  (*Id.* at 114–15, 125).  Martin testified that the whole department felt "unfairly" treated by Schluer.  (*Id.* at 46).

Martin acknowledged that her doctor had placed no limits on her because of her high blood pressure.  (*Id.* at 42–43).  Martin stated in her deposition that she could walk, see, hear, speak, breathe, learn, work, lift things, and care for herself.  (*Id.* at 13).  She stated that she has never had any physical or mental limitations, other than those caused by treatment for colon cancer in 2003.  (*Id.* at 17; 206).[1]  Martin testified that  she had the "same capabilities to do the same thing, the same job" as the other PAT employees.

---

[1] Martin initially stated that had never been either physically or mentally impaired.  ("Physically, no. . . . Mentally, no.").  (Docket Entry No. 20, Ex. A-1, Martin Depo. at 17).  After reviewing the transcript, she changed her answers to "Physically, yes.  My colon cancer physically limited me in my activities," and "Mentally, yes.  My colon cancer impaired my mental functioning from exhaustion and extreme fatigue." (*Id.* at 206).

The summary judgment record narrowly reveals a material factual dispute as to whether Martin was disabled.  Martin's statements that she was not physically or mentally impaired due to her high blood pressure and that she had the same capabilities as her coworkers are admittedly inconsistent with her own statements that her high blood pressure "sometimes" caused her to have headaches, "moments of confusion," and eye "floaters" at work.  But her testimony that her high blood pressure, aggravated by stress, at least sometimes limited her ability to work without error because headaches and "moments of confusion" interfered with her concentration, taken in the light most favorable to her, precludes finding no disability as a matter of law.

### C.    Discriminatory Discharge

To succeed on a discriminatory discharge claim, a plaintiff must show not only that she was disabled, but that her employment was terminated because of her disability.  42 U.S.C. § 1221(a). The *prima facie case* includes a showing that the plaintiff was subject to an adverse employment action and treated less favorably than similarly situated nondisabled employees under nearly identical circumstances.  *Lee v. Kansas City S. Ry. Co.*, 574 F.3d at 259.  If the employer articulates a legitimate nondiscriminatory reason for the dismissal, to avoid summary judgment, the plaintiff must identify or present summary judgment evidence raising a factual dispute as to whether the proffered reason was a pretext for discrimination or a motivating factor in the adverse employment action.  *Rachid*, 376 F. 3d at 312.

### 1.    A *Prima Facie* Showing

The first issue is whether Martin has made a *prima facie* showing.  St. Luke's argues that there is no evidence that it treated nondisabled employees any differently than Martin if they made errors violating HIPAA and work rules after warnings and probation.

13

In discriminatory-discharge cases based on an employee's alleged violation of a "work rule," the employee "may establish a *prima facie* case by showing 'either that he did not violate the rule or that, if he did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'" *Mayberry*, 55 F.3d at 1090 (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)); *see also Greene v. Potter*, 240 Fed. App'x. 657, 660 (5th Cir. 2007) (per curiam) (unpublished); *Martin v. J.A.M. Distrib. Co.*, 674 F. Supp. 2d 822, 833 (E.D. Tex. 2009); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 662 (S.D. Tex. 2008); *Simmons v. Rothe Dev., Inc.*, 952 F. Supp. 486, 490 (S.D. Tex. 1997), *aff'd*, 132 F.3d 1456 (5th Cir. 1997).[2]  The employee "must show that [nondisabled] employees were treated differently under circumstances 'nearly identical' to his." *Mayberry*, 55 F.3d at 1090 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)); *see also Simmons*, 952 F. Supp. at 490; *Lee v. Georgia-Pacific Corp.*, 944 F. Supp. 497, 501–02 (S.D. Miss. 1996) (holding that a plaintiff could not show disparate discipline after admitting to violating the work rule and then failing to prove that employees outside the protected class were treated differently); *see also Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001).

"The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d at 260 (citing

---

[2] The Fifth Circuit developed this rule in Title VII cases. Because "the ADA is part of the same broad remedial framework as . . . Title VII, . . . similar analysis" applies.  *Miller v. Public Storage Mgmt., Inc.,* 121 F.3d 215, 219 (5th Cir. 1997) (citations omitted). Courts have applied the Title VII work-rule analysis in ADA cases.  *Meinelt v. P.F. Chang's China Bistro, Inc.*, 787 F. Supp. 2d 643, 650 (S.D. Tex. 2011); *Jones v. Potter*, No. Civ. A 06–0048, 2007 WL 2071613, at *11 (E.D. La. July 16, 2007); *Mosley v. Potter*, No. H-05-2816, 2007 WL 1100470, at *7 (S.D. Tex. Apr. 11, 2007).

*Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221–22 (5th Cir. 2001); *Okoye*, 245 F.3d at 514; and

*Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1101 (5th Cir. 1985).

Martin admits she made each of the errors.  She also acknowledges the importance of ensuring that patient data is accurate and kept confidential as HIPAA requires.  She claims that the decision to fire her for inaccurately inputting patient data, violating HIPAA as well as St. Luke's rules, was discriminatory because other similarly situated employees were not treated the same way. Specifically, she asserts that St. Luke's had a policy of considering the length of service in disciplining employees and applied that policy to other employees, but not to her.  (Docket Entry No. 25 at 9).  Martin relies on an e-mail from Amber Crawford, an Employee Relations Specialist in St. Luke's Human Resources Department.  In the e-mail, Crawford recommended "probation follow up for Ms. Martin given her 35 years of service with St. Luke's and the fact that she has not made any errors since Feb. 2012."  (Docket Entry No. 25, Ex. E).  Martin acknowledges that there is no written policy at St. Luke's to consider length of service in discipline cases.  (Docket Entry No. 25).

Summary judgment evidence supports St. Luke's contention that its written policy and the practice within PAS was to fire employees who made errors in patient data violating HIPAA while the employee was on probation for a prior similar error, regardless of tenure.  NaToshia Joseph, Schluer's manager, stated that "[b]ecause of the serious nature of [HIPAA] violations, we routinely terminate employees who continue these errors after being placed on probation."  (Docket Entry No. 20, Ex. C. Joseph Affidavit).  St. Luke's has fired other PAS employees who made errors violating HIPAA while on probation, without considering their length of service.  (*Id.*).  According to Joseph, Martin's termination was "consistent with how [St. Luke's] had treated other employees for similar

violations." (*Id.*).  Neither Crawford's e-mail nor other evidence controverts the evidence St. Luke's presents.  Crawford stated that St. Luke's Human Resources Department considered tenure in making employee discharge decisions as a matter of practice, not written policy, and Crawford did not specify whether it applied to all cases in all departments.  The evidence is undisputed that PAS did <u>not</u> have a practice of taking tenure into account in disciplining employees in the type of case at issue here: repeated errors in recording patient data violating HIPAA and St. Luke's rules. (Docket Entry No. 25, Ex. E).

Martin asserts that another PAS employee, Arnonsia Jones, committed the same kind of errors but was not fired.  Jones committed three errors and met with her supervisors after each one was discovered.  (Docket Entry No. 25, Ex. F).  Jones had the same job title as Martin, but she did not have high blood pressure.  (*Id.*).  The summary judgment evidence shows that Jones and Martin were not similarly situated.  Jones did not have the same manager as Martin.  (Docket Entry No. 25, Ex. C, Schluer Depo. at 46–47).  Jones made three errors from 2009 to 2012, while Martin made four errors during roughly the same period.  (Docket Entry Nos. 20, Ex. A-2, Martin Depo. at Exs. 6–9; 25, Ex. F).  Martin's four errors included three HIPAA violations, one made after she was warned and one after she was placed on probation.  (Docket Entry Nos. 20, Ex. A-2, Martin Depo. at Exs. 7–9).  Jones made three errors violating HIPAA, but none while on probation.  (Docket Entry No. 25, Ex. F).  Martin has not identified any other PAS employee who made three HIPAA errors, or who made a HIPAA error after being placed on probation.  (Docket Entry Nos. 20, Ex. A-1, Martin Depo. at 65, 85).  Martin has not made a *prima facie* showing that St. Luke's treated other similarly situated nondisabled employees differently.

### 2.    Pretext or Motivating Factor

16

Assuming that Martin did make a *prima facie* showing, St. Luke's has articulated a legitimate nondiscriminatory reason for discharging Martin.  The issue is whether the record reveals material factual disputes under either a pretext or motivating-factor analysis.  If the employer articulates a legitimate nondiscriminatory reason for the dismissal, to avoid summary judgment, the plaintiff must identify or present summary judgment evidence raising a factual dispute as to whether the proffered reason was a pretext for discrimination or a motivating factor in the adverse employment action.  *Rachid*, 376 F. 3d at 312.

To show pretext, the plaintiff must raise a factual dispute as to whether the employer's stated reason was false and prohibited discrimination was the real reason for the employee's termination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–511 (1993); *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).  The question on summary judgment is whether there is a conflict in substantial evidence to create a jury question of disability discrimination.  *See Gowesky*, 321 F.3d at 512.  Pretext can be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)).  But "mere conjecture that [the] employer's reason is pretext . . . is an insufficient basis for the denial of summary judgment."  *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988); *see also Price v. Marathon Cheese Corp.*, 119 F.3d 330, 336 (5th Cir. 1997).

A plaintiff may also defeat summary judgment by showing a material factual dispute as to whether the employer's proffered reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005) (citing *Rachid*, 376 F.3d at 312). If a plaintiff demonstrates that her disability was a motivating factor in the decision to fire her, the defendant must then prove that the same decision would have been made regardless of discriminatory animus. *Id.*

A plaintiff cannot show either pretext or mixed-motives if the employer's stated reason for the termination is true and the decision was made without knowledge of the employee's disability. *See id.* at 355; *Price*, 119 F.3d at 336. In addition, if "an employee engages in conduct that is legitimately a basis for dismissal, and the employer believes that the employee's conduct is symptomatic of disability, the employer may fire the employee on the basis of the conduct itself, as long as the collateral assessment of disability plays no role in the decision to dismiss." *Newberry*, 161 F.3d at 280. There is no record evidence that the individuals who made the final decision to fire Martin knew of her high blood pressure. Even assuming that Martin told Schluer about her hypertension and her stress-related symptoms, there is no evidence that Joseph or Tang, the final decisionmakers, knew about Martin's high blood pressure and its symptoms or that it factored into their decision. (Docket Entry Nos. 20, Ex. C, Joseph Affidavit; 25, Ex. C, Schluer Depo.). As Martin acknowledged in her deposition, St. Luke's acted with "no evil intent" towards her. (Docket Entry No. 20, Ex. A-1, Martin Depo. at 132).

Martin argues that St. Luke's stated explanation that it terminated her for making multiple HIPAA errors, including one made while on probation, was pretextual because her errors were only "minor mistakes" and because St. Luke's has not offered evidence showing that it reported those

errors to the Health and Human Services Department ("HHS") or notified the patients concerned. (Docket Entry No. 25 at 11).  St. Luke's argues and presented evidence showing that it considers all HIPAA violations to be "serious," and that it applies the same disciplinary policy to all employees who make such violations.  (Docket Entry No. 26 at 5–6).  Martin herself admitted that HIPAA violations were taken seriously at St. Luke's, that it was "never okay" to make mistakes in admitting a patient, and that it was "never acceptable" to give one patient's paperwork to another. (Docket Entry No. 20, Ex. A-1, Martin Depo. at 34–36, 64, 71, 82).  After Martin's third HIPAA error, after discipline progressing from warnings to probation, her supervisors and those responsible for making the final decision on her termination all agreed that Martin's errors were very serious. Their decision to fire her was consistent with how other St. Luke's treated other employees who committed multiple HIPAA violations.  (Docket Entry No. 25, Ex. E).  Even assuming that the decision-makers knew of Martin's high blood pressure, the record reveals no material factual disputes as to the truthfulness of St. Luke's proffered legitimate nondiscriminatory reason for firing Martin, under either a pretext or mixed-motive approach.

Because Martin has not pointed to evidence showing that St. Luke's treated nondisabled employees more favorably than her under similar circumstances, summary judgment is appropriate dismissing Martin's discriminatory discharge claim.

### D.     Reasonable Accommodation

Martin claims that St. Luke's failed to offer her reasonable accommodations for her disability.  The elements of such a claim are that: "(1) the plaintiff is a 'qualified individual with a disability'; (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known

limitations." *Neely*, 735 F.3d at 247 (internal marks omitted) (quoting *Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 740 F.3d 450, 452 (5th Cir. 2013)).  "An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *Griffin*, 661 F.3d at 224, quoting *Chevron Phillips*, 570 F.3d at 621.  The employee must "specifically identify the disability and resulting limitations, and [] suggest the reasonable accommodations." *Chevron Phillips*, 570 F.3d at 621 (quoting *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996)).  "The employer is obligated by law to engage in an interactive process" only after receiving such a request.  *Picard v. St. Tammany Parish Hosp.*, 423 F. App'x 467, 470 (5th Cir. 2011).  The requested accommodation must be reasonable.  "It would not be a reasonable accommodation to require the employer to eliminate essential job functions, modify job duties, reassign existing employees, or hire new employees, or, absent special circumstances, to undermine an established seniority system." *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011) (citing *Burch v. City of Nacogdoches,* 174 F.3d 615, 621 (5th Cir. 1999) and *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 405–06 (2002)).  To defeat a motion for summary judgment, a plaintiff must show that the accommodation requested is reasonable on its face.  *U.S. Airways*, 535 U.S. at 401–02.

St. Luke's has presented competent summary judgment evidence showing that Martin did not request reasonable accommodations for her symptoms.  Martin claims that she told Schluer about her high blood pressure.  (Docket Entry Nos. 20, Ex. A-1, Martin Depo. at 113; 25, Ex. A, Martin Affidavit).  She testified in her deposition that St. Luke's should then have accommodated her by hiring more staff in her department or by moving some of the functions of her department to other departments.  (Docket Entry No. 20, Ex. A-1, Martin Depo. at 127–130).  There is no evidence that she requested these accommodations at the time.  And, as a matter of law, a request to hire more

staff, reassign employees, or restructure a job is not a request for a reasonable accommodation. *Burch*, 174 F.3d at 620.

Martin also testified in her deposition that she asked Schluer to "adjust her responsibilities" to eliminate her responsibility for training other employees and to "streamline" the registration process. (Docket Entry Nos. 20, Ex. A-1, Martin Depo. at 126; 25 at 12–14). Despite her tenure, Martin wanted new employees to go to other staff members when they had questions instead of coming to her. (Docket Entry No. 20, Ex. A-1, Martin Depo. at 124–28). Martin's requests that St. Luke's modify her job duties, assign her responsibilities to other employees, or change internal processes were not requests for reasonable accommodations. *See Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1991); *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295–96 (5th Cir. 1998) (citing *Reigel v. Kaiser Foundation Health*, 859 F. Supp. 963, 973 (E.D.N.C. 1994) (holding that a physician's request to transfer to a position that would not require him to supervise other employees or perform administrative functions was not a reasonable accommodation)).

St. Luke's is entitled to summary judgment on Martin's failure to accommodate claim.

## III.    Conclusion

St. Luke's motion for summary judgment is granted. Final judgment will be entered by separate order.

SIGNED on September 23, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge